Magdalena LOPEZ, Appellant–
Defendant,

v.

STATE of Indiana, Appellee.

No. 45A03–0609–CR–00411.

Court of Appeals of Indiana.

July 17, 2007.

Thomas W. Vanes, Office of the Public Defender, Crown Point, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, George P. Sherman, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

Following her plea of guilty but mentally ill to two counts of Murder, a felony,[1] Appellant–Defendant, Magdalena Lopez, appeals her aggregate sentence of 110 years in the Department of Correction by claiming it is inappropriate in light of her character and the nature of her offense.

We affirm.

---

1. Ind.Code § 35–42–1–1 (Burns Code Ed. Repl.2004).

The record reveals that on July 19, 2005, Lopez made an emergency 911 call reporting that she had killed her children. Upon arriving at Lopez's residence in Dyer, Sergeant David Swinford of the Dyer Police Department found her sons, Antonio Lopez, age nine, and Erik Lopez, age two, lying dead in a significant amount of blood in the dining and living room areas of the house. According to Sergeant Swinford, there was a substantial amount of blood on the floor, walls, blinds, and ceiling in the kitchen and dining room area as well as in the garage. Sergeant Swinford testified that upon conducting an interview with Lopez, she told him that she had killed both of her children because "she believed that they would be in a better place." Tr. at 26. According to Sergeant Swinford, Lopez detailed for him the events leading up to and including the deaths of her children, including the fact that the day had begun and proceeded normally until approximately 8:30 or 9:00 p.m. when she began to have thoughts of killing them. Lopez provided no justification for these thoughts apart from her belief at the time that they would be in a better place. These thoughts lasted approximately an hour and included her contemplation, while using a frying pan in the kitchen to warm up some food, that the frying pan was not significant enough to kill the children. According to Sergeant Swinford, Lopez told him that she had followed Antonio into the garage, where she picked up a ten-pound weight and struck him in the back of his head, telling him he would be better off in heaven. Antonio, apparently responding that he did not want to go to heaven, managed to escape from Lopez and run inside the house. Lopez chased Antonio with the weight and caught him inside the dining room area, where she pushed him

to the ground face-down, straddled him, and struck him in the head multiple times with the weight, telling him "just go to heaven." State's Exhibit 6 at 5. Upon determining that Antonio had no signs of life, she took the weight into the living room area, where she found her other son, Erik, who had just come down the stairs and was sitting on the living room couch. Lopez indicated to Sergeant Swinford that at that moment she contemplated calling 911 to turn herself in, but decided she should kill Erik as well because he would be better off in heaven, especially because she would be unable to protect him from being hurt or picked on or alone when she was in jail. Lopez then reportedly hugged and kissed Erik, pushed him face down to the floor, told him to "go to heaven now," and proceeded to hold him down with her left hand while beating him over the head with the weight using her right hand until there was adequate damage to his head such that she was convinced he was dead. State's Exhibit 6 at 5. Lopez then called her husband, as well as her sister, to report what she had done, before calling 911.

As detailed in the probable cause affidavit, a ten-pound free weight, which appeared to have blood on it, was discovered close to Erik's body, and subsequent autopsies revealed that the children had died as a result of blunt force injury to their skulls.

On July 21, 2005, Lopez was charged with two counts of murder. At a March 1, 2006 guilty plea hearing, pursuant to a plea agreement with the State, Lopez pleaded guilty but mentally ill to both counts of murder, and the State agreed to refrain from seeking the death penalty or life imprisonment without parole.[2] Following an August 7–8, 2006 sentencing hear-

---

**2.** Pursuant to Indiana Code § 35–50–2–9 (Burns Code Ed. Repl.2004), the State may seek a sentence of death or life imprisonment without parole if a victim(s) of the murder is less than twelve years of age.

ing, the trial court sentenced Lopez to the advisory[3] term of fifty-five years in the Department of Correction for each murder conviction, with the sentences to be served consecutively, for an aggregate sentence of 110 years in the Department of Correction. Lopez filed her notice of appeal on September 7, 2006.

Upon appeal, Lopez claims that her sentence is inappropriate in light of her character and the nature of her offense. Lopez points to her admissions and guilty plea, her lack of criminal history, and her demonstrated mental illness in requesting reduced and concurrent sentences. The State responds by pointing to the nature and circumstances of the crime and to the fact that two children were killed, not one, in claiming the imposition of consecutive fifty-five-year sentences was appropriate.

 We may revise a sentence authorized by statute if it is inappropriate in light of the nature of the offense and the character of the offender. *Childress v. State,* 848 N.E.2d 1073, 1079–80 (Ind.2006) (citing Ind. Appellate Rule 7(B)). While we have held that we do not use "great restraint," we nevertheless exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires that we give "due consideration" to that decision and because we recognize the unique perspective a trial court has when making sentencing decisions. *Stewart v. State,* 866 N.E.2d 858, 865–66, (Ind.Ct.App.2007). A defendant bears the burden of persuading the appellate court that his or her sentence is inappropriate. *Childress,* 848 N.E.2d at 1080.

In sentencing Lopez, the trial court stated the following:

"On today's date the Court is going to find that on your plea of guilty but mentally ill to two counts of murder, the Court is going to accept your plea and we're going to sentence you as follows:

The nature and circumstances of this crime the Court finds to be particularly heinous in that these children were beaten severely with a ten pound weight. That in order to assure their demise, the defendant checked to make sure that they were dead.

In addition, in between the two beatings, she took pause, thought about what to do with the second child, and made a determination to beat him and kill him with the same weight.

The Court is going to find no prior juvenile history and that the defendant's character is one that prior to this incident she had led a law abiding life and from the reports from all who testified on her behalf today, she was a good person.

That the age of the victims are two and a half and ten [sic] and a half years old.

The Court is going to find mitigators today in that the defendant has no history. That she admitted her guilt. That she suffers from Bipolar Disease, a mental illness.

I'm going to find aggravating, the nature and circumstances of this crime in that it was extremely heinous. I've set out those prior.

But in giving weight to the mitigator—the other aggravators are the age of the children, the position of trust and of course the nature and circumstances of the crime.

In giving weight to the mental illness, the Court finds that the extent of her inability to control her behavior due to this disorder has not been clearly set out

---

**3.** *See* Ind.Code § 35–50–2–3 (Burns Code Ed. Supp.2006).

in the facts today as it relates to this crime.

The Court acknowledges that from time to time when she was in her depressive state she was unable to even provide for her own personal hygiene that some other family members had to take care of those responsibilities for her. That did not appear to be the condition she was in at the time of this event, as prior to this event she had gone on a trip, a bus trip with the two boys to Detroit. Her recounting of that trip was that they had a good time not that she was in any depressive state and couldn't function.

She's suffered from this mental illness for approximately two years, cycling between highs and lows.

That she did seek help for herself on many occasions in many venues, from many doctors, types of doctors and it was not until after this event apparently that we got an exact diagnosis and she was placed on medication which seems to help her.

The—again the nexus of this event and her mental illness is not clear to the Court. There [are] some indicators here that she, the reports that she gave to the police were not consistent with the stories that she gave—the reports that she gave after the event. Prior to the event, there [were] no voices telling her what to do. Her demeanor was calm when she reported the event. She gave thought to the crime in between each event. She checked the boys to make sure they weren't breathing.

Prior to the police coming she washed her hands and her face, her glasses. So, I'm not clear as to exactly whether she was, whether this mental illness had a direct nexus to her, to this particular crime.

In weighing the aggravators and the mitigators the court is going to find that they are balanced, give equal weight to each and the Court is going to sentence her to fifty-five years in the Department of Correction.

As to the concurrent or consecutive nature, the Court is going to sentence her consecutively. I feel that to do otherwise first of all, I consider this to be even though they were in the same event, the fact that she stopped and thought about the second crime in my mind makes the difference. It also, I also feel that to do anything other than consecutive sentencing would be to diminish the life of one of these children. Each of these boys deserved a sentence for their own life, an individual life.

The Court will find today that each aggravating factor standing alone is in and of itself a significant aggravator." Sentencing Tr. at 193–97.

■ As a preliminary matter in our review of Lopez's sentence, we observe the trial court's statement that the aggravators and mitigators were in equipoise. In cases of such balance, our Supreme Court has said that a trial court may not impose consecutive sentences. *See Wentz v. State,* 766 N.E.2d 351, 359 (Ind.2002); *Marcum v. State,* 725 N.E.2d 852, 863–64 (Ind.2000). Despite its finding of balance, however, the trial court subsequently considered the additional non-statutory aggravating factor that Lopez had killed two children, not one, and that failure to impose consecutive sentences would diminish the life of one of the children. *See Serino v. State,* 798 N.E.2d 852, 857 (Ind.2003); *O'Connell v. State,* 742 N.E.2d 943, 952 (Ind.2001); *see also Walton v. State,* 650 N.E.2d 1134, 1136–37 (Ind.1995) (overturning enhanced sentence due to improper aggravator but affirming imposition of consecutive sentences due to multiple kill-

ings). Because the court based its imposition of consecutive sentences upon this free-standing aggravating factor, its initial finding of balance does not serve to invalidate the consecutive nature of the sentences. *See Gleaves v. State*, 859 N.E.2d 766, 771 (Ind.Ct.App.2007).

■ Lopez does not dispute the disturbing nature of her offenses, including the facts that she killed each of her two young sons, one after another, by beating them in the head repeatedly with a ten-pound weight. Lopez instead argues that in spite of the "disturbing" nature of her offenses, her strong character is sufficiently weighty such that her sentence should be reduced. Appellant's Brief at 5. In support of her character, Lopez points to the facts that she lacked any criminal history, that she admitted her guilt, and further, that her actions were largely a reflection of her mental illness rather than of her character.

In evaluating Lopez's character, we observe that our Supreme Court has considered the combination of a defendant's lack of criminal history and her mental illness to be a significant *mitigating circumstance. Crawford v. State*, 770 N.E.2d 775, 782–83 (Ind.2002). We additionally observe that while Lopez's guilty plea reflects positively upon her character, it is not necessarily a significant mitigating factor. *Scott v. State*, 840 N.E.2d 376, 383 (Ind.Ct.App. 2006), *trans. denied.* Although in taking the plea, Lopez saved the State the resources necessary for trial, the evidence indicating her guilt in the instant case was sufficiently strong and the plea, which saved her from a possible sentence of death or life imprisonment without parole, was sufficiently beneficial such that entering into the plea agreement may have been as much a pragmatic decision as an effort at taking responsibility.

Regarding Lopez's mental illness, we look to several factors our Supreme Court

has outlined for purposes of determining its due weight: (1) the extent of the defendant's inability to control his or her behavior due to the disorder or impairment; (2) overall limitations on functioning; (3) the duration of the mental illness; and (4) the extent of any nexus between the disorder or impairment and the commission of the crime. *Biehl v. State*, 738 N.E.2d 337, 340 (Ind.Ct.App.2000) (citing *Weeks v. State*, 697 N.E.2d 28, 30 (Ind.1998)), *trans. denied.*

The trial court found that Lopez suffered from bipolar disorder, but upon considering the above factors, questioned the extent to which such factors demonstrated Lopez's illness had caused her to kill her children. With respect to the first two factors, the court, while acknowledging that Lopez's mental illness occasionally affected her personal hygiene, was not wholly convinced that Lopez's disease impaired her ability to control her actions or function in light of the fact that she had taken a bus trip to Detroit with her two boys just prior to the killings and had indicated no state of depression or inability to function at that time. With respect to the third factor, the court found Lopez had suffered from bipolar disorder for approximately two years and during this time had cycled between highs and lows, that she had sought help multiple times, from multiple doctors, and that only after the killings did she receive an exact diagnosis and receive medication which seemed effective. With respect to the fourth factor, the court further questioned the nexus between Lopez's illness and her killings due to the decisive nature of the killings, her initial failure to attribute her actions to the "voices" which she later claimed caused her to act, her calm reporting of the incident, and her efforts at cleaning up afterward.

Lopez urges that we re-evaluate the trial court's analysis of her mental illness,

arguing there was a clear nexus between her mental illness and the acts at issue, which according to Lopez is the only explanation for such acts in view of her thirty-year history of law-abiding behavior. In considering Lopez's claims, we observe the conclusions of Dr. Eric Ostrov's report, to which Lopez refers us, finding a great deal of evidence that Lopez suffers from severe bipolar disorder with rapid cycling between manic and depressive states. According to Dr. Ostrov, Lopez's ability to function significantly worsened after she experienced a miscarriage in July of 2003 and that she became highly depressed thereafter, leading to her attempts to choke Antonio in December 2004 and her subsequent efforts to find psychiatric help.[4] In February of 2005, Lopez attempted suicide and was encountering increasing problems in her marriage. Dr. Ostrov determined that Lopez's mental state on the day she killed her children was "shaped by the intense depression she was experiencing." App. Vol. III at 68. She felt "abandoned, alone, helpless, nervous, and non-contributive" which led to "negative, distorted thinking," which itself intensified her depression. App. Vol. III at 68. Dr. Ostrov additionally concluded that Lopez had paranoid feelings regarding whether Antonio would be molested or otherwise abused, that she felt helpless to protect her children, and that she thought they would be better off in heaven than with her and her husband. Dr. Ostrov further opined, however, that the evidence did not support a finding that Lopez was psychotic when she killed her children, that her subsequent references to the devil putting thoughts in her mind was "consistent with her cultural background"[5] and that language she used to describe visions was "contraindicative of psychotic functioning." App. Vol. III at 69. While there can be no doubt that Lopez's mental illness led to distorted thinking, given Dr. Ostrov's conclusions that Lopez was not suffering from psychotic episodes at the time of the murders, we conclude the trial court was justified in questioning the extent to which Lopez's mental illness was in control of her behavior and caused her to commit the crimes at hand.

Even where all four factors indicate strongly that the crimes at issue are directly attributable to a defendant's mental illness, however, the mitigating weight of such illness has generally served to favor the imposition of the presumptive,[6] rather than a reduced, sentence, especially when the nature of the offense is particularly egregious, as Lopez concedes is the case here. See Crawford, 770 N.E.2d at 783 (reducing defendant's 65-year sentence to presumptive 55-year sentence due in part

---

4. According to Dr. Ostrov's report, beginning in March of 2005 the Indiana Department of Child Services (DCS) investigated the December 2004 choking incident and was made aware that Lopez had tied Antonio up and told him to "go to heaven" as she was choking him. Appendix Volume III at 18, 196. Following a final June 30, 2005 follow-up call, however, Lopez reported that the family, including Antonio, were doing well. The case was determined to be unsubstantiated and was subsequently closed. Upon sentencing Lopez, the trial court acknowledged how many people, including DCS, had failed the children and Lopez in this case.

5. Lopez apparently stated during her evaluation that throughout her life, if something bad happened, she would say the devil did it to her.

6. Prior to the April 25, 2005 sentencing amendments, we referred to "presumptive" sentences to indicate the legislature's suggested sentence for a particular crime absent the finding of aggravators and mitigators (or upon a finding that the aggravators and mitigators balanced). With respect to Lopez, whose actions occurred after such amendments, we refer instead to the "advisory" sentence. See I.C. § 35–50–2–3.

to significant mitigating circumstances of mental illness and lack of criminal history); *Mayberry v. State*, 670 N.E.2d 1262, 1271 (Ind.1996) (remanding for imposition of presumptive sentence upon finding defendant's mental illness and lack of criminal history to be a mitigating factor); *see also Weeks v. State*, 697 N.E.2d 28, 31 (Ind. 1998) (reducing defendant's 60–year sentence to the presumptive 50–year sentence due to mental illness); *Archer v. State*, 689 N.E.2d 678, 685–86 (Ind.1997) (reducing defendant's enhanced sentences on two counts to presumptive sentences due to mental illness); *Gambill v. State*, 675 N.E.2d 668, 677–78 (Ind.1996) (reducing defendant's enhanced sentence to the presumptive sentence upon considering substantial mitigating value of mental illness); *Barany v. State*, 658 N.E.2d 60, 67 (Ind. 1995) (remanding for imposition of presumptive sentence upon consideration of defendant's mental illness); *Ankney v. State*, 825 N.E.2d 965, 977 (Ind.Ct.App. 2005) (reducing defendant's enhanced 15–year sentence to presumptive 10–year sentence upon finding defendant's mental illness entitled to mitigating weight and warranted a reduction in his sentence), *trans. denied*.

While we acknowledge *Biehl*, 738 N.E.2d at 339–40, which Lopez cites as authority for her claim that the facts of mental illness and lack of criminal history merit a reduced sentence, we find it distinguishable. In *Biehl*, the defendant, who was schizophrenic and living in an abandoned barn, was approached and threatened by four teenage boys, two of whom he later shot, resulting in the death of one and injury to the other. Following imposition of the presumptive sentence and the defendant's successful petition for post-conviction relief on the basis that the trial court failed to consider his mental illness as a mitigating circumstance, the trial court upon remand imposed the same presumptive sentence in spite of its finding no aggravators and three mitigators, among them mental illness and lack of criminal history. In reducing his sentence to the minimum, our court reasoned that the trial court's sentence was manifestly unreasonable[7] because the trial court had failed to assign any mitigating weight to the defendant's complete lack of criminal record and his longstanding mental illness.

Here, in contrast, there were clear aggravators, particularly the nature and circumstances of the crime, in which Lopez without any provocation beat her own young children to death, pausing after the death of her first child and contemplating killing her second child before turning on him as well. While Lopez's mental illness and lack of criminal history merited significant mitigating weight, considering the grievous nature of her offenses and the longstanding precedent favoring imposition of the presumptive sentence under such circumstances, this mitigating weight serves only to offset the significant aggravating weight of the nature and circumstances of the crime. *See Crawford*, 770 N.E.2d at 783. Accordingly, we are confident that the trial court's imposition of the advisory fifty-five-year sentences was not inappropriate in light of Lopez's character

---

**7.** Prior to January 1, 2003, Indiana Appellate Rule 7(B) provided the following: "The Court shall not revise a sentence authorized by statute unless the sentence is manifestly unreasonable in light of the nature of the offense and the character of the offender." The amended rule reads, "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." We recognize the revised language grants us broader authorization to revise sentences. *See Long v. State*, 865 N.E.2d 1031, 1034 n. 2 (Ind.Ct.App. 2007).

and the nature of her offenses. We further conclude, based upon our above reasoning, that the imposition of consecutive sentences for the murder of two children, resulting in an aggregate sentence of 110 years, similarly was not inappropriate. *See Walton,* 650 N.E.2d at 1137.

The judgment of the trial court is affirmed.

VAIDIK, J., concurs.

ROBB, J., concurs in result.